UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

PATRICIA MONTYSKO,

                                             Plaintiff,

           v.

                                               6:05-CV-00250

COMMISSIONER OF SOCIAL                     (LEK/GJD)
SECURITY,

                                        Defendant.

_____

IRA MENDLESON, III, Attorney for Plaintiff
WILLIAM H. PEASE, Assistant U.S. Attorney, Attorney for Defendant

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits.

## PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on May 2, 2001 alleging she became disabled on May 4, 2000. (Administrative Transcript ("Tr") at 86-88). The application was initially denied on July 18, 2001. (Tr. 33-36). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on July 3, 2002. (Tr. 280-97). Plaintiff testified without counsel. *Id.* On October 15, 2002, the ALJ issued a decision denying benefits. (Tr. 23-32). On July 3, 2003, the Appeals Council reversed the ALJ's decision, citing a lack of medical evidence supporting plaintiff's ability to perform light work and inadequate consideration of Dr. Rogers's opinion.

(Tr. 60-63).

The Appeals Council remanded the case to the same ALJ for a new hearing. *Id.* The ALJ held a second hearing on January 12, 2004. (Tr. 298-333). Plaintiff was represented by counsel at the second hearing. *Id.* The ALJ issued a second decision denying benefits on January 30, 2004. (Tr. 9-21). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on January 14, 2005. (Tr. 4-6).

## CONTENTIONS

Plaintiff raises three claims for this court's review:

1.  The ALJ improperly relied upon Dr. Goodman's non-examining opinion. Brief at 13-20.

2.  The ALJ failed to properly assess plaintiff's credibility. Brief at 20-22.

3.  The ALJ failed to ask the Vocational Expert (VE) hypothetical questions containing the appropriate limitations in plaintiff's residual functional capacity. Brief at 20.

Plaintiff argues that reversal of the administrative decision is mandated, and benefits should be awarded. Defendant argues the Commissioner's decision is supported by substantial evidence, and the complaint should be dismissed.

## FACTS

### 1.    Non-Medical Facts

Plaintiff was born in January 1960 and was forty-four years old at the time of the ALJ's January 2004 hearing. (Tr. 301). Plaintiff was a high school graduate and worked for nearly twenty years as a clerk at the Department of Motor Vehicles before stopping work in May 2000. (Tr. 302-303). Plaintiff stopped working because of a

"terrible pain" in her lower left back, and has not worked since May of 2000.[1]  (Tr. 303).  At the January 2004 hearing, plaintiff testified that she drove once or twice a week and was able to dress, bathe, cook, grocery shop, wash dishes, and do laundry. (Tr. 302, 307).

## 2.   Medical Facts

Plaintiff claims disability based upon arthritis in her spine and pain in the lower left side of her back, neck, and right shoulder. (Tr. 100).   As a young teenager, plaintiff was diagnosed with Brown Sequard syndrome which has resulted in some weakness in her lower left extremities. (Tr. 142, 221, 235).  The medical evidence includes treating physician records, an examining physician's opinion, and a non-examining physician's assessment.

### A.   Treating Physicians

Numerous physicians have treated plaintiff; including, orthopaedic surgeons Dr. John H. Kavanaugh, Dr. John T. Whalen, and Dr. Allen Carl; occupational physician Dr. Lynne Portnoy; and Dr. Kokwai Yap.[2]

---

[1]The record indicates plaintiff attempted to return to work after May 2000.  Dr. Yap's treatment notes appear to indicate plaintiff planned to work part-time the week following plaintiff's November 27, 2000 treatment.  (Tr. 186).  On January 8, 2001, plaintiff told a physical therapist that she was only able to work for two and a half hours.  (Tr. 180).  On April 13, 2001, Dr. Yap noted plaintiff had tried to work but was unable to tolerate a half day of work and was contemplating disability.  (Tr. 164).  the court assumes plaintiff's work attempts after May 2000 were failed attempts to return to work and that plaintiff has not engaged in substantial gainful activity since May 2000.

[2]The Court notes Dr. Bastow, a podiatrist, also treated plaintiff between 1992 and August 2001 for foot aliments; including, keratotic lesions and plantar verruca on the right foot.  (Tr. 188-205).

3

### 1.    Dr. Kavanaugh

John Kavanaugh, M.D., an orthopaedic surgeon, treated plaintiff after she stopped working in May 2000. On May 31, 2000, Dr. Kavanaugh noted that plaintiff walked with a limp, favoring her left side. (Tr. 142). Plaintiff lacked motion in her left hip *without any pain*. (Tr. 142). Due to neurological problems in her lower extremity, plaintiff had decreased motion and strength in her ankles and feet. (Tr. 142). Dr. Kavanaugh stated that x-rays of plaintiff's pelvis and left hip "look[ed] good." *Id.* X-rays of plaintiff's back revealed left convex scoliosis, spina bifida distally, and spondylolisthesis at the right L 4-5. (Tr. 142). There was an enlarged spinous process on the right side. (Tr. 142). Dr. Kavanaugh diagnosed back strain in addition to her underlying orthopedic and neurologic problems. He suggested physical therapy and prescribed Aleve for pain relief. (Tr. 142).

On June 21, 2000, Dr. Kavanaugh stated that plaintiff still had pain in her buttock and left leg. (Tr. 140). He concluded that the pain was caused by plaintiff's back. (Tr. 140). Dr. Kavanaugh decided plaintiff should stop physical therapy because it had not helped. (Tr. 141). He ordered an MRI. (Tr. 141). On July 5, 2000, Dr. Kavanaugh stated that plaintiff still had pain in her back and left leg. (Tr. 140). Dr. Kavanaugh reviewed the MRI with plaintiff. The MRI showed L5-S1 thickening of the ligamentum flavum, superimposed upon a congenital narrow canal. (Tr. 140). Dr. Kavanaugh gave plaintiff a note excusing her from work and referred her to Dr. Whalen for evaluation. (Tr. 140).

### 2.     Dr. Whalen

John Whalen, M.D., an orthopedic surgeon, evaluated plaintiff on August 3, 2000, and diagnosed left sacroiliac (SI) joint dysfunction and lumbar congenital anomalies with degenerative changes and narrowing neural foramen. (Tr. 135-36). During his examination, Dr. Whalen noted plaintiff had "some difficulty" moving around the examining room, walked with her left hip "somewhat flexed," and had lower back pain when internally rotating her hip.  (Tr. 136).  Dr. Whalen prescribed Vioxx and recommended a conservative treatment program that included physical therapy exercises.  (Tr. 137).

### 3.     Dr. Kokwai Yap

Between November 2000 and April 2001, Dr. Yap treated plaintiff with physical therapy, chiropractic manipulation, steroid injections, and acupuncture. (Tr. 103, 161-62, 163-64, 167-68, 170-71, 172-73, 174, 176, 178-79, 181, 182, 185-86, 230). Plaintiff had many complaints about pain in her shoulder (Tr. 175, 177) and in her low back (Tr. 176, 180).  The physical therapy treatment lasted between November 2000 and April 2001, and included heat treatment, stretching, and TENS unit treatment.  (Tr. 165, 166, 169, 175, 177, 180, 184, 187).  The reports indicate that plaintiff experienced some relief from these treatments. (Tr. 184).

### 4.     Dr. Allen Carl

Allen Carl, M.D., a fellow of the American College of Surgeons, treated plaintiff in April and May 2003.  Plaintiff complained of pain over the left iliac crest, left calf, and left SI joint. (Tr. 243).  On April 9, 2003, Dr. Carl's examination revealed weak

dorsi and plantar flexor on the left side, (Tr. 243), and April 9, 2003 x-rays revealed spina bifida occulta at L5. (Tr. 243). Dr. Carl stated if plaintiff had come to him "just to identify whether she should be considered disabled," Dr. Carl would not make that determination. (Tr. 244). Dr. Carl **specifically** stated that he would "be unable to say that [plaintiff] couldn't do **any job**." (Tr. 244)(emphasis added). He suggested that plaintiff see an occupational physician for such a determination. (Tr. 244). Dr. Carl also asked plaintiff to obtain her other doctors' notes so that Dr. Carl could determine what type of shots had been administered previously in order to determine possible locations for the pain. (Tr. 243-44).

On April 30, 2003, plaintiff brought Dr. Carl some notes regarding previous injections, however, the notes did not give Dr. Carl all the information that he needed. (Tr. 239). The doctor then discussed how he could attempt to determine the origin of the pain so that he could make the injections more beneficial to plaintiff. (Tr. 239). Dr. Carl also stated that he could not guarantee that he would find a solution to plaintiff's problem, but that it was a "judgment call" as to how far plaintiff wished to go with the treatments. (Tr. 240).

On May 6, 2003, Dr. Carl performed a steroid/lidocaine injection into plaintiff's left SI joint that caused fairly significant relief in plaintiff's lower left back. (Tr. 241). Dr. Carl told plaintiff to attend physical therapy and begin exercising. (Tr. 238, 267). Dr. Carl wanted plaintiff to start physical therapy to strengthen her muscles and stated that if physical therapy worked, then "exercise needs to become a religion." (Tr. 238).

### 5.    Dr. Lynne Portnoy

Lynne Portnoy, M.D., D.C., an occupational physician and the Medical Director at the Eastern New York Occupational & Environmental Health Center, examined plaintiff twice - once in May 2003 and once in December 2003. (Tr. 234-36, 270).

On May 6, 2003, Dr. Portnoy stated that plaintiff appeared to be in "moderate distress." (Tr. 235).  She had an epidural injection on the same day, and she had marked antalgia, tenderness and stiffness in her low back. (Tr. 235).  She had decreased range of motion at the plantar flexion of her left foot. (Tr. 235).  Plaintiff's examination revealed plaintiff's cervical range of motion to be "essentially normal" except for decreased lateral bending, and plaintiff's "mildly decreased" range of motion in the right shoulder. (Tr. 235).  There was no atrophy in plaintiff's upper extremities, and muscle testing resulted in a score of 5/5. (Tr. 235).

Dr. Portnoy noted decreased discrimination of light touch at all left lower extremity dermatomes and marked weakness in left ankle and knee extension and left hip flexion.  (Tr. 236).  Dr. Portnoy was unable to evaluate plaintiff's gait due to her discomfort, but found that the muscles in her left ankle were markedly weak and that there was diminished muscle tone in plaintiff's left leg. (Tr. 236).  He also found marked weakness in extension of plaintiff's left ankle, knee, and in flexion of the left hip. (Tr. 236).

Dr. Portnoy's impression was that plaintiff had partial paresis of the left lower extremity that would "somewhat" interfere with full-time employment. (Tr. 236).  Dr. Portnoy thought plaintiff  could alternate positions during the day, but would not be

able to sit, walk, or stand for ***prolonged*** periods. (Tr. 236).  Dr. Portnoy advised against repeated bending, lifting, and overhead work.  (Tr. 236).

There is no actual medical record for plaintiff's December 2003 examination by Dr. Portnoy.  Page 270 of the transcript is a January 7, 2004 letter from Dr. Portnoy to plaintiff's counsel.  In Dr. Portnoy's letter, she discusses the December 11, 2003 examination. (Tr. 270).  Dr. Portnoy stated in the letter that at plaintiff's second examination, in December 2003, Dr. Portnoy essentially found no significant clinical change in plaintiff's condition between the May 2003 and December 2003 examinations. (Tr. 270).

Dr. Portnoy found that plaintiff walked with a marked limp on the left and in the examination room, was unable to bear weight on her left leg due to her ankle problem. (Tr. 270).  It was difficult to evaluate plaintiff while she was standing, so Dr. Portnoy examined her while sitting and determined that she had atrophy of the large and small muscles around the left ankle. (T. 270).  Plaintiff could only perform straight leg raising to 70 degrees on the left, while she was able to achieve 90 degrees on the right side. (Tr. 270).  There was diminished bulk of one half inch at the left calf and two inches at the left thigh. *Id.*  Dr. Portnoy found plaintiff capable of driving short distances, but limited in walking, bending, carrying, and prolonged sitting.  (Tr. 270).

## B.    Consultative Examining Physician

William Rogers, M.D. examined plaintiff on August 29, 2002.  (Tr. 221-28).  Dr. Rogers notes that plaintiff had Brown Sequard syndrome, with resulting left lower extremity paresis and spasticity, left low back pain radiating to the left leg, and lumbar

degenerative disc and osteoarthritic changes. (Tr. 224). Dr. Rogers's musculoskeletal examination revealed no atrophy in the upper extremities, full movement of the cervical spine and all joints of the upper extremities, no spinal tenderness at any level, tenderness over the left sciatic notch, and lumbosacral spinal range of motion at sixty degrees flexion, fifteen degrees extension, and twenty degrees lateral flexion bilaterally. (Tr. 223). Dr. Rogers' neurological exam revealed diffusely intact sensation, moderate spasticity in the left lower extremity, and motor strength of 4/5 in the right triceps and left quadriceps. (Tr. 223). Dr. Rogers reviewed a June 2000 MRI showing degenerative changes at L 3-4 and L 4-5 with foraminal stenosis and facet joint asymmetry at L5-S1. (Tr. 223).

In Dr. Rogers's narrative report, he stated that plaintiff could sit for a few hours at a time if she were in a comfortable chair, but then could only be on her feet for about ten minutes at a time before her left buttock and leg symptoms would be aggravated. (Tr. 222). Dr. Rogers stated that plaintiff could perform household chores, but needed to rest "on and off" while doing so. (Tr. 222). Dr. Rogers stated that plaintiff used Tylenol infrequently and was not on any other medication and was not under any other type of treatment at that time. (Tr. 222). Standing and walking were the most bothersome, and plaintiff told Dr. Rogers that she never lifted anything heavier than a gallon of milk. *Id.* Dr. Rogers stated that she had aches in the posterior right shoulder if she wrote too long or if she held a cup of coffee out in her right arm. Dr. Rogers found that plaintiff would occasionally experience some tingling down the right forearm to the wrist. *Id.*

Dr. Rogers also completed a "Medical Source Statement of Ability to Do Work-Related Activities." (Tr. 225-28).  In this form, Dr. Rogers indicated that plaintiff could occasionally and frequently lift less than ten pounds, stand or walk for less than two hours during an eight hour day, and sit for about six hours during an eight hour day. (Tr. 226).  Dr. Rogers stated that plaintiff had a mild limitation in pushing and pulling with her right upper extremity, and stated that plaintiff's left leg was too spastic to push. (Tr. 226).  Plaintiff also had limited reaching ability in all directions, including overhead reaching on the right side. (Tr. 227).  It appears from the form that plaintiff could reach occasionally with the right upper extremity and constantly with the left side. (Tr. 227).  Additionally, Dr. Rogers stated that plaintiff could never climb, balance, kneel, crouch, crawl, or stoop, and had some restrictions based on the work environment.  (Tr. 228).

## C.    Non-Examining Physician

Richard Goodman, M.D. reviewed plaintiff's medical file in October 2003 and completed an assessment of plaintiff's abilities. (Tr. 255-61).  Dr. Goodman found that none of plaintiff's back pain allegations were supported by the medical evidence, but noted that "no documentation of abnormal x-rays of the lumbar spine or abnormal CAT scans of the lumbar spine" were present within the medical record.  (Tr. 256, 258).  Dr. Goodman determined plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand for six hours during an eight-hour day, sit for six hours during an eight-hour day, and could occasionally climb, kneel, crouch, and crawl.  (Tr. 259-61).

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R.  §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work.  Finally, if the

11

claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

**1.  Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258.  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 2.   **Residual Functional Capacity (RFC)**

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *LaPorta v. Bowen*, 737 F. Supp. at 183.  Furthermore, an ALJ must specify the functions plaintiff is capable of performing, and may not simply make

conclusory statements regarding a plaintiff's capacities. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In his first decision in this case, the ALJ found that plaintiff could return to her previous light work as an office clerk. (Tr. 26-32). The Appeals Council remanded the case to the same ALJ. (Tr. 61-62). In its remand decision, the Appeals Council found that "there is no medical opinion in the record in support of a light residual functional capacity". (Tr. 61). The Appeals Council also found that the ALJ did not "give adequate consideration to the limitations assessed by Dr. Rogers." (Tr. 61-62). The Appeals Council ordered that the ALJ obtain updated medical evidence with respect to plaintiff's impairments; give consideration to treating and examining source opinions; consider ordering an updated consultative examination or an updated medical expert opinion; evaluate the requirements of plaintiff's past work; and obtain a vocational expert if necessary. (Tr. 62).

The ALJ did consider additional evidence. Dr. Carl's reports; Dr. Portnoy's reports; and Dr. Goodman's report were all obtained after the ALJ's first decision. The ALJ also utilized the services of Dr. Peter Manzi, a vocational expert (VE). After considering the evidence, the ALJ found that plaintiff was able to perform "a wide range of sedentary work activity." (Tr. 18, 19). The ALJ commented that the "record simply does not document findings to establish the existence of pathologies which are so advanced as to preclude the performance of ***all forms of competitive employment***." (Tr. 19)(emphasis added).

In making his RFC determination, the ALJ placed greater weight on the opinion

14

of non-examining expert Dr. Goodman because "his findings are not inconsistent with the objective findings contained in the medical record as a whole." (Tr. 17).  The court first notes that Dr. Goodman essentially found that plaintiff could perform light work, being able to lift no more than 20 pounds occasionally and 10 pounds frequently, sit, stand, and walk for 6 hours each. *Compare* (Tr. 259-61) *with* 20 C.F.R. § 404.1567(b) (the definition of light work).  Dr. Goodman did find that plaintiff would be limited in her ability to push and/or pull with her lower extremities. (Tr. 260).

Although the ALJ gave great weight to Dr. Goodman's opinion, the ALJ found that plaintiff was limited to sedentary work and called a vocational expert because plaintiff might not have been able to do the full range of sedentary work.  It is unclear how Dr. Goodman's opinion relates to this finding.  ***Additionally, and more importantly***, Dr. Goodman states in his answers to the ALJ's interrogatories that his rejection of plaintiff's allegations is based on the fact that "[t]here is no documentation of abnormal x-rays of the lumbar spine or abnormal CAT scans of the lumbar spine." (Tr. 258).

This statement by Dr. Goodman is completely inaccurate.  Although Dr. Rogers did not order x-rays on the date of his examination, he did state that he reviewed an MRI of June 23, 2000, showing "degenerative changes at L3-4 and L4-5 with foraminal stenosis along with facet joint asymmetry at L5-S1." (Tr. 223).  Dr. Portnoy also reported reviewing plaintiff's MRI, showing a defect at L3-4 and possibly a lesion at L5-S1. (Tr. 234).  On May 31, 2000, x-rays of the lumbar spine ordered by Dr. Whalen showed "abnormalities of the posterior elements at the l-s junction primarily of

L5 with spina bifida occulta." (Tr. 136).  Dr. Whalen also noted partial lumbarization of S1. *Id.*  He also stated that the spinous processes of L5-S1 appear to impinge.

Dr. Whalen also stated that he reviewed the June 23, 2000 MRI. (Tr. 136).  He stated that the MRI "demonstrates ***significant*** degenerative changes at L3-4 with end plate changes." *Id.* (emphasis added).  Dr. Whalen stated that disc bulging/osteophyte formation was resulting in some narrowing in the neural foramen bilaterally, and there were degenerative and some neural foramen narrowing at L4-5 also.  There was facet joint asymmetry and some narrowing in the neural foramen. (Tr. 136).  Dr. Whalen commented that the report found the foraminal stenosis only on the left side, but Dr. Whalen stated that it seemed to be more on the right side. *Id.*  It is true that Dr. Whalen recommended conservative treatment, but it is clear that, contrary to Dr. Goodman's statement, there ***is documented evidence of abnormal x-rays of the lumbar spine***.  If Dr. Goodman based his opinion on a misconception of the record, then the ALJ erred in giving Dr. Goodman's opinion greater weight, and the ALJ's opinion regarding plaintiff's RFC is ***not*** supported by substantial evidence.

## 3.   <u>Vocational Expert (VE)</u>

Plaintiff argues that the limitations stated in Dr. Rogers's report prevent plaintiff from performing even sedentary work.  Plaintiff argues that the ALJ should have relied upon Dr. Rogers's evaluation in determining plaintiff's RFC and in questioning the VE.  A review of Dr. Rogers's August 2002 report shows that he found that plaintiff could lift and carry less than 10 pounds, could stand less than two hours in an eight hour day, could sit about six hours, but had severe restrictions in her ability to push

and pull with both her upper and lower extremities. (Tr. 225-28).

Plaintiff also argues that if the ALJ were to rely upon Dr. Rogers's assessment, it is not consistent with an ability to perform even sedentary work, and therefore, plaintiff should be found disabled. The court notes that even assuming that Dr. Rogers's RFC assessment does not meet the criteria for sedentary work exactly, the fact that plaintiff could not perform a full range of sedentary work does ***not automatically*** render her disabled.

Generally if a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations, or when the Grids[3] do not fully account for the plaintiff's limitations, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Rosa v. Callahan*, 168 F.2d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986). Non-exertional impairments include postural and manipulative limitations such as reaching, handling, stooping, climbing, or crouching. *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004).

If the plaintiff's range of work is significantly limited by her non-exertional or other impairments, then the ALJ must present the testimony of a VE or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform. *Id.* at 384. A VE may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any

---

[3] The Medical-Vocational Guidelines are referred to as the Grids. 20 C.F.R. Part 404, Subpt. P, Appendix 2. *See Rosa v. Callahan*, 168 F.2d 72, 78 (2d Cir. 1999). The Grids take into account a plaintiff's RFC, together with her age, education, and prior work experience. *Id.*

of those jobs given his or her functional limitations. *See Rosa v. Callahan*, 167 F.3d at 78; *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence,[4] a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for the VE's testimony. *See De Leon v. Secretary of Health and Human Services.*, 734 F.2d 930, 936 (2d Cir. 1984); *Dioguardi v. Comm'r of Social Security*, 445 F. Supp. 2d 288, 298-99 (W.D.N.Y. 2006). The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [his] opinion." Dumas, 712 F.2d at 1554.

In this case, since the ALJ's assessment of RFC was based in part upon an incorrect assumption by Dr. Goodman, the ALJ's hypothetical questions that were based upon Dr. Goodman's assessment are also not supported by substantial evidence. Plaintiff states that when her attorney asked the VE whether plaintiff could perform alternative work if the VE considered Dr. Rogers's RFC, the VE responded that there were no jobs that plaintiff could perform. (Tr. 328-29). The VE based this opinion on the fact that Dr. Rogers stated that plaintiff could stand for ***less than two hours***. (Tr. 329-30). If plaintiff could stand for less than two hours and sit for six hours, then the VE stated that plaintiff could not work a full 8 hour day. Plaintiff thus argues that the court should accept Dr. Rogers's RFC, reverse the Commissioner's decision, and remand this case for calculation of benefits since the VE has already testified that if

---

[4] *Dumas*, 712 F.2d at 1554 n.4.

Dr. Rogers's RFC is accepted, plaintiff will not be able to perform ***any*** alternative work.

This court cannot agree.  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Marcus v. Califano*, 615 F.2d 23 (2d Cir. 1979) (remanded for reconsideration under standard that subjective evidence of disabling pain, if credited, may support a finding of disability); *Cutler v. Weinberger*, 516 F.2d 1282 (2d Cir. 1975).  Reversal is appropriate, however, when there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health & Human Serv.*, 705 F.2d 638, 644 (2d Cir. 1983) (reversal without remand for additional evidence particularly appropriate where payment of benefits already delayed for four years; remand would likely result in further lengthening the "painfully slow process" of determining disability).

In this case, although the ALJ's reliance upon Dr. Goodman's report was error, and the VE stated that Dr. Rogers's RFC evaluation would essentially render the plaintiff disabled, there are other medical records upon which a proper RFC evaluation may be based.  The record contains extensive notes from Dr. Kavanaugh, reports from Dr. Carl and Dr. Lynne Portnoy.  The court does note that Dr. Portnoy stated that plaintiff was not able to engage in "***prolonged sitting***," however, it is unclear how long that period of time would be.  When the VE was asked about an individual who had to

19

change positions, he stated that if the plaintiff had to "sit and stand every five or 10 minutes and change their positions, it would be difficult to deal with doing work like that." (Tr. 323).

The doctors in this case do not state that plaintiff must change positions "every five or 10 minutes." It is unclear whether Dr. Portnoy's assessment of an inability to sit for "prolonged" periods would constitute this drastic requirement. However, neither the ALJ nor plaintiff's counsel clarified this statement by the VE. Dr. Carl refused to assess RFC and stated that he would not make that kind of determination. (Tr. 244). In May of 2003, Dr. Carl suggested that plaintiff go to physical therapy and exercise regularly. (Tr. 238). Thus, the court cannot find that the record contains persuasive proof of disability sufficient to remand for calculation of benefits. There are still gaps in the record regarding plaintiff's RFC and its effect on her ability to work. The case should be remanded for proper determination of plaintiff's RFC and for an additional evaluation by a VE, utilizing the proper RFC evaluation.

## 4.   Pain

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step

analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

In this case, plaintiff argues that the ALJ did not properly analyze plaintiff's complaints of pain.  The ALJ found that plaintiff's allegations as to the frequency and

severity of her symptoms and limitations are not "fully credible" and "overstated." (Tr. 18). The ALJ then stated that plaintiff's daily activities were inconsistent with Dr. Rogers's "drastic limitations." The ALJ stated that the plaintiff testified to an ability to perform "numerous activities" such as taking care of her personal needs, performing light housekeeping, cleaning, cooking, driving, and shopping *Id.* The ALJ noted that plaintiff took only over-the-counter medication for pain, and that she had cortisone injections every four months. Although the ALJ acknowledged that plaintiff could experience some discomfort from her impairments, he did not find evidence that the pain is of such frequency, intensity, or duration to preclude substantial gainful activity.

While the above analysis is in keeping with the requirements of the regulations, the ALJ does make a troublesome comment in the decision. The ALJ makes a statement that plaintiff does not have "objective findings to establish the existence of pathologies which are so advanced as would preclude the performance of substantial gainful activity." (Tr. 18). The court would first point out that the ALJ may not make medical judgments and cannot substitute his opinion for competent medical opinions. *Rosa v. Callahan*, 168 F.3d at 78-79. Second, if the ALJ is making this comment based upon Dr. Goodman's statement that the plaintiff's allegations of pain are unsupported because there is no documentation of abnormal x-rays of the lumbar spine, (Tr. 258), then as stated above, the ALJ's conclusion is ***not supported by substantial evidence***.

Since this court cannot determine how much reliance the ALJ placed upon Dr. Goodman's apparently incorrect statement, this court must also recommend remanding this case for a re-evaluation of plaintiff's pain.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **REVERSED**, and this case be **REMANDED** pursuant to **Sentence Four** of 20 U.S.C. § 405(g) for a proper determination of RFC, pain, and ability to perform alternative work in the national economy, consistent with this Report.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: December 22, 2006

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

23